### W. H. BUTLER *vs.* MARSHALL CHAMBERS.

### November 12, 1886.

**Constitution — Police Power—Sale of Oleomargarine—Title of Act.**
   The provisions of Laws 1885, *c.* 149, § 4, are valid, as a legitimate exercise of the police power of the state, and are not foreign to the title of the act, within the intent and meaning of section 27, article 4, of the constitution.

The plaintiff brought this action in the district court for Ramsey county, to recover the value of merchandise sold and delivered to the defendant. The answer set up as a defence that the merchandise was manufactured out of oleaginous substances, and out of a compound other than that produced from unadulterated milk, and out of a compound other than that produced from cream from unadulterated milk; that it was, when sold, an article manufactured and designed to take the place of butter produced from unadulterated milk, and to take the place of butter produced from cream of unadulterated milk; that it was offered for sale and sold to defendant as an article of food; that it was not pure skim-milk cheese made from pure skim-milk, and that it was offered for sale and sold and delivered contrary to the provisions of Laws 1885, *c.* 149. Defendant appeals from an order by *Brill*, J., sustaining a demurrer to the answer.

   *Rogers & Hadley*, for appellant.

   *Warner, Stevens & Lawrence*, for respondent, cited *People* v. *Marx*, 99 N. Y. 377; *Chy Lung* v. *Freeman*, 92 U. S. 275; *In re Wilson*, 32 Minn. 145; *State* v. *State Medical Board*, 32 Minn. 324; *Yick Wo* v. *Hopkins*, 118 U. S. 356, (6 Sup. Ct. Rep. 1064.)

   VANDERBURGH, J. The demurrer to the answer brings up the con-

stitutional validity of Laws 1885, *c.* 149, § 4. The act is entitled "An act to prohibit and prevent the sale or manufacture of unhealthy or adulterated dairy products." Section 1 provides a penalty for selling, or exposing for sale, "unclean, impure, unhealthy, adulterated, or unwholesome milk," or the product thereof. Section 2 provides that "no person shall keep cows for the production of milk for market, or for sale or exchange, or for manufacturing the same into articles of food, in a crowded or unhealthy condition, or feed the cows on food that is unhealthy, or that produces impure, unhealthy, diseased, or unwholesome milk;" and also prohibits the manufacture or sale of the products of such milk. Section 3 prohibits the sale or delivery to any butter or cheese manufactory of "any milk diluted with water, or unclean, impure, or adulterated milk." Section 5 provides a penalty for exposing for sale butter or cheese branded or labelled with a false brand. Section 6 regulates the sale of condensed milk, and other provisions relate to the appointment and duties of the dairy commissioner.

These provisions of the statute are all unquestionably within the legislative authority; but it is contended that section 4 is unconstitutional especially on the ground that it is an infringement upon the rights, privileges, and liberty of the citizens, without due process of law. The section in question reads as follows: "No person shall manufacture, out of any oleaginous substance or substances, or any compound of the same, or any compound other than that produced from unadulterated milk, or of cream from the same, any article designed to take the place of butter or cheese produced from pure, unadulterated milk, or cream from the same, or shall sell, or offer for sale, the same as an article of food. This shall not apply to pure skim-milk cheese, made from pure skim-milk."

The defendant contends that these provisions fall within the general police powers of the state, and are therefore valid.

In 1881 the legislature passed an act entitled "An act to regulate the traffic in oleomargarine." Laws 1881, *c.* 133. This act provides that "any person who shall knowingly sell, or offer for sale, any article or substance in semblance of butter, not the legitimate product of the dairy, made exclusively of milk and cream, but into the compo-

sition of which the oil or fat of animals, or melted butter, or any oil thereof, enters as a substitute for cream, in tubs, firkins, or other original packages, not distinctly, legibly, and durably branded, * * * shall be guilty of a misdemeanor," etc. It cannot be doubted that the act of 1881 was a legitimate exercise of police power. The public may be protected by appropriate legislation against imposition in the purchase of articles for consumption; and if, as we may assume, the prevalent compounds resembling butter in appearance and flavor, and put on the market as a substitute for it, and generally known as "oleomargarine," "butterine," etc., are liable to deceive and mislead purchasers and consumers as to the real nature of the product, and especially if such preparations are made of unwholesome ingredients, then we think there may be sufficient reasons why the legislature may, in its discretion, meet the evil sought to be remedied by provisions for the suppression of the manufacture and sale of such artificial compounds altogether. *State* v. *Addington*, 12 Mo. App. 214; S. C. 77 Mo. 110; *People* v. *McGann*, 34 Hun, 358.

It cannot be necessary, at this day, in view of the numerous decisions of the state and federal courts, to enter into any elaborate discussion to show that the legislature may exercise such powers in behalf of the state. As respects the right or liberty of the citizen to engage in business, and conduct industrial pursuits, these privileges are to be enjoyed in subordination to the general public welfare, and all reasonable regulations for the preservation and promotion thereof. "All property," says the court in *Com.* v. *Alger*, 7 Cush. 53, 85, "is held subject to the general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations, established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient." *Thorpe* v. *Rutland & B. R. Co.*, 27 Vt. 140, (62 Am. Dec. 625.)

The reasonable limits of the exercise of such power it is not easy to define. It is not a matter of caprice or unlimited discretion on the part of the legislature; but these questions can usually be best de-

termined as cases arise, and, within proper limits, it is for the legislature to judge as to the extent and character of restrictive measures which may be found necessary in any particular class of cases. In *Metropolitan Board of Excise* v. *Barrie*, 34 N. Y. 657, 666, the court say: "A state is not sovereign, without the power to regulate all its internal commerce as well as police. * * * It is a bold assertion at this day that there is anything in the state or United States constitutions conflicting with, or setting bounds upon, the legislative discretion or action in directing how, when, and where a trade shall be conducted in articles intimately connected with the public morals, public safety, or public prosperity; or, indeed, to prohibit and suppress such traffic altogether, if deemed essential to effect those great ends of good government."

It is also well settled that such laws are not invalid because in conflict with the power of congress over commerce. In the *License Cases*, 5 How. 504, 577, it is said: "A state is not bound to furnish a market for imported goods, nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens." And so in *Bartemeyer* v. *Iowa*, 18 Wall. 129, it was held that such legislation was not in conflict with the fourteenth amendment of the federal constitution. *Com.* v. *Kimball*, 24 Pick. 359, (35 Am. Dec. 326, 332.)

The amended New York law on the subject under consideration (Sess. Laws N. Y. 1885, c. 458, § 2) prohibits, among other things, the manufacture, except from unadulterated milk and cream, of any product "in imitation or semblance of" natural butter made from cream, and also prohibits the sale of any article produced in violation of such act. In *People* v. *Arensburg*, 40 Hun, 358, a conviction for the violation of that act was sustained, on the ground that the legislature might not only interpose to protect the public health, but to prevent fraud and imposition in the simulation of a healthy article of food universally consumed by the people; and upon this proposition we are disposed to rest our decision in this case. The case just cited arose subsequent to that of *People* v. *Marx*, 99 N. Y. 377, (2 N. E. Rep. 29,) but was distinguished from it on the ground of the difference in the wording of the statutes under which the convictions

were had. In the latter case the prosecution was under a section like that of our own statute now under consideration, and the statute was held void chiefly because it was construed to be an attempt on the part of the legislature to drive the manufactured article from the market for the benefit of another industry, and to protect those engaged in the manufacture of dairy products against the competition of cheaper substances, capable of being applied to the same uses; in other words, that the object of the statute was to prohibit one industry in order to foster another. This assumes that the object of the legislation was for the benefit of a class, and that there were no reasonable grounds for the exercise of the police power; because, if there were such grounds, it is no objection that a legitimate industry is incidentally benefited, as the practical result of the operation of the statute. We do not think the court would be warranted in setting aside this legislation on such grounds. As said by the court in *People* v. *Albertson*, 55 N. Y. 50: "Courts do not sit in review of the discretion of the legislature, or determine upon the expediency, wisdom, or propriety of legislative action, in matters within the power of the legislature. Every intendment is in favor of the validity of statutes, and no motive, purpose, or intent can be imputed to the legislature in the enactment of a law other than such as are apparent upon the face, and to be gathered from the terms of the law itself."

Oleomargarine and kindred products have been manufactured and disposed of to a greater or less extent for years, and there has been sufficient opportunity to test, by observation and experience, their general character, and the methods adopted in conducting the business of the manufacture and sale of such substitutes for butter, so as to enable the legislature to determine as to the necessity or propriety of police regulation or restriction. It is doubtless easy to introduce cheap and unwholesome ingredients into their manufacture, and the product is easily passed off upon the consumer, under the semblance of butter, without detection of the fraud.

As respects similar legislation restricting the sale of milk mixed with water, the court in *Com.* v. *Waite*, 11 Allen, 264, use this language: "It is notorious that the sale of milk adulterated with water is extensively practised with a fraudulent intent. It is for the legis-

lature to judge what reasonable laws ought to be enacted to protect the people against this fraud, and to adapt the protection to the nature of the case." Similar statutes, prohibiting the sale of milk reduced below a certain standard on account of the presence of water, were held constitutional in *Com.* v. *Evans*, 132 Mass. 11, and in *State* v. *Smyth*, 14 R. I. 100. We know of no good reason, therefore, why laws for the suppression, as well as regulation, of the manufacture and sale of the compounds against which the statute in question appears to be levelled, may not be sustained.

The language of the section in controversy is the same as that in similar statutes of several of the states. In some instances the objection has been raised that its terms are too broad, and may be intended to include, not merely the compounds referred to, but other harmless preparations which consumers might choose to use in the place of butter. This point is not, however, raised by counsel in this case. It was assumed upon the argument that the statute in question was intended to restrain or suppress the manufacture and sale of oleomargarine and like compounds resembling, and intended as a. substitute for, butter.

From the title of the act, and the general tenor and manifest object of its provisions, it may be fairly construed, we think, to have been directed against the manufactured substitutes for butter above designated; and the statute will hardly be construed to apply to articles bearing so little resemblance to butter that they could not be substituted for it as an article of commerce. For example, olive oil is sold for table use, yet we think it could not reasonably be held to be a substitute for butter, within the meaning of the section in question; and that a prosecution for the sale of such articles under this act could not be sustained under the strict rule of construction applicable to criminal prosecutions.

2. It is claimed that the act is repugnant to article 4, § 27, of the constitution, on the ground that the subject-matter of section 4 is not embraced in the title. But the provisions of that section are, we think, legitimately connected with the subject of the act and included therein. An article manufactured and sold as butter, which is not a genuine dairy product, would fairly come within the spirit and ob-

ject of the act, as entitled, without reference to the extent of adulteration, or the peculiar process of manufacture, and though the product be wholly simulated.

This legislation sufficiently conforms to the title, and, as before observed, is justified upon the ground that the use of the inhibited compounds, in its tendency and results, is injurious to the public health; and especially because the adulterated article is not readily distinguished from the genuine, and is easily substituted for it, so as to work a fraud upon those who actually use and consume it, as well as upon purchasers; and for these reasons it was considered by the legislature that the mischief could only be effectually suppressed or remedied by the imposition of severe penalties.

What the nature of the remedy should be, within the proper limits of the police power, was for the legislature to determine, and with the wisdom or policy of such legislation the courts have nothing to do.

Order reversed.