# THE SUPREME COURT

OF THE

# STATE OF NEVADA

## JANUARY TERM, 1905

[No. 1659.]

### EX PARTE PETER KAIR.

EIGHT-HOUR LAW—CONSTITUTIONALITY—POLICE POWER—HEALTH REGULATION.

1. Act of February 23, 1903 (Stats. 1903, p. 33, c. 10,) imposing a penalty on any one working more than eight hours a day in any mine, smelter, or mill for the reduction of ores, is not void, under Const. Nev. art. I, sec. 1, guaranteeing the right to acquire and possess property, but is sustainable as a valid health regulation under the police power.
2. Nor does it violate the eighth amendment to the federal constitution, forbidding the imposition of excessive fines and cruel and unusual punishments.
3. The statute being sustainable as a valid health regulation within the police power, owing to the fact that prolonged labor in such places is injurious, as a matter of common knowledge, evidence that defendant's occupation was not injurious is not admissible in a prosecution under the statute.
4. Where one is imprisoned on a conviction under a statute entirely void, the remedy is *habeas corpus*.

APPLICATION by Peter Kair for *habeas corpus* to secure his release from the county jail of Lyon County, where he was committed for a violation of Stats. 1903, p. 33, c. 10. **Applicant remanded.**

The facts sufficiently appear in the opinion.

*Alfred Chartz*, for Petitioner:

I. *Admissibility of evidence:* In general the court may hear testimony and evidence to determine whether the prisoner should be remanded, held to bail, or discharged from custody. (Vol. 9, Ency. of Pl. & Pr., p. 1052, and authorities cited.) Evidence may be received to show want of probable cause to hold the prisoner. (Id., p. 1053.)

Comp. Laws, 3764, says: "If it shall appear to the judge, by affidavit, or upon hearing of the matter, or otherwise, * * * shall cause the complainant, or other necessary witnesses, to be subpenaed to attend at such time as shall be ordered, to testify before such judge." On this point it is submitted that all the testimony taken before the committing magistrate and the testimony introduced before the court are part and parcel of the case.

II. *Testimony is admissible to overcome the judgment of the legislature:* There is a line of decisions which holds that a legislative enactment cannot be overridden by testimony. For instance, the constitutionality of the eight-hour law depends on the question as to whether its provisions are within the police power of the state. "If judicial knowledge fails to disclose whether a statute is a legitimate exercise of the police power, evidence should be introduced to enlighten the judicial mind. The abuse of power depends on facts which can be determined as well as any other facts. Only by this means can adequate protection be extended to newly discovered industries, and a line of decisions, unsound in the light of later experience, be avoided by the courts." (Harvard Law Review, Feb. 1904, p. 269; *People* v. *Marx*, 99 N. Y. 377; *People* v. *Lochner*, 177 N. Y. 145; *Atkin* v. *Kansas*, 191 U. S. 207; Northern Securities Case.)

*City of Cleveland* v. *Clements Bros.*, 59 L. R. A. 781, says: "The judgment of the general assembly in such cases is not conclusive."

*In re Jacobs*, 98 N. Y. 98, says: "Under the guise of a police regulation personal rights and property cannot be invaded arbitrarily, and the determination of the legislature is not final or conclusive," quoted at page 15, *Ex parte Boyce*, in Pacific Reporter. See, also, page 3, *Ex parte Boyce*, in which,

as in the New York case, judicial notice is taken of extraneous facts in support of the law, and if admissible in support of the law, it is admissible against it. So, if the rule held by this court in the Boyce case, that the decisions of California and Ohio do not apply by reason of the fact of later decisions, the old rule, that the judgment of the legislature could not be questioned or varied by testimony, no longer applies by reason of the fact that the line of later decisions vary that rule.

The decisions on the eight-hour law are practically unanimously based upon facts, and, therefore, it is submitted that, if the facts of the case at bar show that the occupation of working in a wet-crushing mill is healthful, the constitutional right of private individuals to enter into contracts for labor cannot be interfered with under the guise of the police power of the state. So, if underground mining is attended with dangers peculiar to it, laws adapted to the protection of such miners from such danger should be confined to that class of mining, and should not include other employments not subject to them. (*Ex parte Boyce, supra*, p. 5.) So, if dry-crushing quartz-mills are attended with dangers peculiar to them, laws adapted to the protection of those who work in them should be confined to that class of milling and should not include wet-crushing mills not subject to such dangers. Particular attention is called to the foregoing comparison, on the ground that it is firmly believed that the legislature did not intend to include within the provisions of the act employments that were healthful and safe   The object of the act is to insure safety and health of laboring men, and not to interfere with the rights of those who enjoyed safe and healthful employments. If counsel for the state claims that the legislature intended to take away from man his right to work more than eight hours, in the interest of the general public in employments where the general public is not interested, let him say so.

III. The right of a state to declare that no one working for it, or for any municipalities in it, has been upheld by the Supreme Court of the United States, with dissenting opinions by the Chief Justice and Justices Brewer and Peck-

ham (*Atkin* v. *State of Kansas*), and the decision rests solely on that ground. On the question of the right of individuals to contract one with the other, they say it is a question of such large import that they do not decide it, and do not need to, showing that, according to the opinion of that court, the case of *Holden* v. *Hardy* does not decide the question. The right of the state to enact laws forcing railroad companies to put on safety couplers, or mining companies to place steel bonnets over their cages, and all similar laws, is not questioned, and they should not be invoked in support of the case at bar. It is begging the question. The state legislature may also have the right to enact laws affecting the welfare of women and children (and I claim it has no such right as to women competent to contract for themselves), but, as to man, he is the lord, and he will not permit any interference with his right to dispose of his labor as he chooses, and there are many women who would fight for that right as bravely as man would. It is idle to suppose and presume that a man will receive as much for eight hours' labor as he would for more hours of labor. Such economic questions must settle themselves on the basis of man's ability to earn money for his employer. If he has not sufficient time in twenty-four hours to earn enough to pay for his employment, it is only a question of time when he must be discharged or go unpaid for his labor.

IV. *The law is in contravention of article VIII of the amendments to the constitution of the United States:* The petition pleads the foregoing fact. Article VIII of the amendments to the constitution of the United States reads as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." If the Court of Appeals of New York took judicial knowledge from reading dictionaries, medical journals, semi-medical journals, pseudo-medical journals, and quarterly reviews of different kinds, and what not, the Supreme Court of Nevada will not close its eyes to legislative enactments of this state as a basis upon which to find facts.

V. An act relating to vagrancy and vagrants (Comp. Laws, 4860) provides that any person convicted of vagrancy

may be imprisoned in the county jail for a term not exceeding ninety days, and that means that one day would be the minimum of punishment. The above act is taken as a basis upon which to decide whether an excessive fine has been prescribed by the legislature, because it is the opposite of industry. It is most respectfully submitted that an act which prescribed as its minimum a fine of $100 for working more than eight hours is an excessive fine, coming within the purview of the constitutional inhibition. The attorney-general claimed such fine was not excessive, because, he said, defendant would not have to pay it, but some one else would. What difference does it make to this court who has to pay it? The fine seems to be excessive and unreasonable, and, in the language of the attorney-general, "absurd and ridiculous."

VI. It is submitted that the punishment "is so severe and out of all proportion to the offense as to shock public sentiment and violate the judgment of reasonable people." (Vol. 8, Ency. of Law, 2d ed., p. 440; art. I, sec. 6, Nev. Con.) The fine is excessive and the punishment severe and out of all proportion to the injury the petitioner committed on society, and the fine could not be less under the law, and the law is therefore unconstitutional. Such a law brands industry as a crime and ennobles slothfulness, laziness, shiftlessness, comparatively speaking, in so far as punishment is concerned.

*James G. Sweeney*, Attorney-General, for Respondent:

I. Where the record is complete, and it is not questioned that it is a full and correct copy of the proceedings and testimony of the lower court, and where the return is not controverted or denied, testimony is not admissible, nor will it be introduced on a hearing of a petition of *habeas corpus* in this court; the issue raised is one of law only, which must be tried upon the case made, and no fact *de hors* the record can legally be considered. (Vol. 9, Ency. Pl. & Pr., p. 1052; *Ex parte Bird*, 19 Cal. 130; Church on *Habeas Corpus*, sec. 350, and authorities there cited.) It is submitted to the court that if the law were otherwise, the supreme court would be con-

verted from an appellate into a trial court—a principle this court has in emphatic terms, at different times in various opinions, stated it will not allow or do. It is further submitted that it is "absurd" to insist that testimony is admissible to add to or make up a different case than that which the record discloses upon which the petitioner was convicted, it being full and complete and not controverted.

II. The act of the legislature of Nevada, approved February 23, 1903, entitled "An act regulating the hours of employment in underground mines and smelters, and providing penalties for the violation thereof," being a regulation within the police power of the state, is constitutional and is conclusive in itself, although no evidence contradictory to the claim that work in "reduction works" is healthful employment appears. (*Sanders* v. *Commonwealth*, 77 S. W. (Ky.) 358; *In re Ten-Hour Law for Street Railways*, 61 L. R. A. (R. I.) 612; *State* v. *Cantwell*, S. W. (Mo.) 568; *Ex parte Boyce*, 27 Nev. 299, and authorities there cited.) That the law may seem unreasonable, oppressive, or absurd, or that there may be objection to its policy or expediency, is not sufficient to justify its judicial repeal. These are matters which are solely within the discretion of the legislature. (*Ex parte Boyce*, 27 Nev. 299; *Mayor of New York* v. *Millen*, 11 Pet. 138; Cooley Const. Lim. 164; *Nathan* v. *Alabama*, 8 How. 73; *Pattison* v. *Yuba*, 13 Cal. 179–92; *People* v. *Gillson*, 109 N. Y. 406; *Commonwealth* v. *McWilliams*, 11 Pa. St. 61–70; *Sharpless* v. *Mayor*, 21 Pa. St. 147, 161–2; *Passenger Cases*, 7 How. 402; *Ah Lim* v. *Territory*, 1 Wash. St. 162; *Williams* v. *Commack*, 27 Miss. 209.) In the case of *Sanders* v. *Commonwealth*, *supra*, appellant was convicted of selling milk from cows fed on "still slop" in violation of the statute; he gave evidence showing that "still slop" used under proper conditions was not unhealthful food for dairy cows, and that their milk when thus fed was pure and wholesome. This presents a case identically parallel with the one at bar, in which petitioner attempts to show that the work in which he is engaged is not injurious to health. In the Kentucky case no evidence was offered on behalf of the state, but the court held that the law in itself

was conclusive. It is submitted that this is the only safe rule, because, if otherwise, every person would be a law unto himself, setting up his judgment against that of the legislature, and would render the law nugatory.

III. Counsel for petitioner has mistaken his remedy in the case at bar. In this court the constitutionality of the law itself may be considered settled. Petitioner claims that his case does not come within the purview of the law, in that the testimony shows the employment in which he is engaged as being not unhealthful. The justice held that the law does apply to such a case, which resolves the issue practically into one of statutory construction. If the justice wrongly interpreted the law, it was error, which should have been corrected on appeal, but not on *habeas corpus*. It is not denied but that the court had full jurisdiction to act in the premises, which, as a rule, cuts out the remedy of *habeas corpus*. It is just the same as if a man were convicted of murder or robbery or burglary, and set up the facts as proved did not constitute the crime charged. And it is respectfully submitted that the remedy is one of appeal, and not of *habeas corpus*. (*Ex parte Winston*, 9 Nev. 71; *Ex parte Maxwell*, 11 Nev. 428; *Ex parte Bergman*, 18 Nev. 331; *Ex parte Crawford*, 24 Nev. 92; *Ex parte Edgington*, 10 Nev. 215; *Ex parte Smith*, 2 Nev. 338.)

*Alfred Chartz*, for Petitioner:

POINTS AND AUTHORITIES ON SUBMISSION.

I. The court asks: First—"Can the statute under which petitioner was convicted be sustained as constitutional otherwise than as a health regulation within the police power of the state?" I can comfortably permit the attorney for the state to answer that question, and let it drop. My answer, however, is that it cannot, and the legislature of the state cannot, under the guise of the police power of the state, deprive man of his civil and industrial liberty to contract for the disposition of his labor, according to his inclination, his needs, and the needs of his family. The legislature did not say that employment in mines, smelters and reduction works is either unhealthful or dangerous, and this court, in *Ex parte*

*Boyce*, has simply assumed that it is upon the private information of one member that working in a dry-crushing mill at Delamar was unhealthful.

Second—"If it can only be sustained on the ground that it is such health regulation, is the court bound by the admission of fact in the record that the employment followed by petitioner is not unhealthful, and, if so, should the testimony taken on the hearing, subject to the objection of the attorney-general, be stricken out?" Without the taking of testimony admitted by the court under the objections of the attorney-general there is sufficient matter shown in the record proving conclusively to the court that the occupation of a millman in a wet-quartz crushing-mill is healthful, pleasant, and much sought after, and in no way calls for the interference of police power of the state to prevent man from exercising and enjoying his rights to dispose of his labor as best he may, according to his strength, his family, and circumstances in life, to promote his own welfare in accordance with his own individual judgment. The decision in *Ex parte Boyce* settles the second question. A decision of the supreme court of this state is as good and binding as a statute of the state. In that case the court accepted hearsay testimony. If this court accepted hearsay testimony in that case to the effect that labor in a dry-quartz crushing-mill was unhealthful, why should it not accept the testimony of the expert millmen, with great and long experience, although taken on the hearing on the application for the writ, and although the same might not be admissible? Peter Kair testified that he worked in quartz mills for nearly thirty years, and had very good health. It is submitted that the appellate court should not speculate on the fact that other wet-crushing quartz-mills are not healthful or dangerous to work in.

Third—"Can the court take judicial knowledge of the fact that employment in mills for the reduction of ores is unhealthful, and consequently exclude the testimony and ignore the admission of fact mentioned?" Employment in mills for the reduction of ores is nowhere recognized as healthful or unhealthful, or dangerous. It is nowhere enumerated as a fact that any court can take judicial knowledge

of. It is an uncertain quantity and depends entirely upon proof. The legislature has not said that it is unhealthful. It has simply singled out the industry in which the hours of labor shall be limited, but in no way has it intimated that employment in mines, mills, ore reduction works, or smelters is unhealthful or dangerous. It has passed no judgment on that point.

Fourth—"In how far is the court bound to conclude that employment in such mills is unhealthful because the legislature has enacted that the hours of labor therein shall be limited?" It seems to me that the foregoing is a very important question. The legislature of this state has limited the hours of labor, but has not said that any employment, anywhere, in any capacity, is either unhealthful or dangerous. If the foregoing statement is true, wherein does judgment lie? It lies in the supreme court of this state. What on? It must be based on testimony. The testimony shows beyond any doubt that employment in wet-crushing mills is preferable to any employment upon the farm. Testimony being introducible on this point, the court should feel itself bound by the testimony introduced. No court and no decision shows or tends to show that the judges did not base their decisions upon the facts proved to ascertain whether the employments designated by the legislature were in fact dangerous. If it were otherwise, in order to introduce an eight-hour day for labor in all classes of employment, all the legislature would have to do would be to designate all classes of employment by name, and its *dicta* would become law, and the miner working 3,000 feet underground would be limited to eight hours' work per day, and ranch hands would need to work no longer, and could not contract to work longer, because the legislature had settled the question that his occupation was unhealthful and dangerous equally with the occupation of the miner. "The question of jurisdiction to cause a commitment or imprisonment, whether before or after a judgment of conviction, is always a proper subject of inquiry on *habeas corpus*. And in order to determine this jurisdiction, either in respect to the subject-matter or to the person, the court will go through the whole case, if neces-

sary, even if such an inquiry involves an examination of facts outside of, but not inconsistent with, the record." (Vol. 9, Ency. of Pl. & Pr., p. 1045, and authorities cited at notes 1 and 2.) The indictment may be looked into so far as to ascertain whether the court had jurisdiction of the offense charged in it. (Id., p. 1046; 100 U. S. 339.) Even *ex parte* affidavits could be received by this court in evidence. (*Joab* v. *Sheets*, 99 Ind. 328.) Evidence could be received even to contradict the return. (Vol. 9, Ency. of Pl. & Pr., p. 1052, note 6.) "And the evidence taken before the magistrate may be looked into and examined, or additional testimony received, in order to determine the sufficiency, legality, or regularity of the commitment." (Id., p. 1057.) The court may go behind the record in its inquiry into this question where the tribunal is one of appellate jurisdiction in respect to the court by which the commitment was made, or where the latter court was one of inferior or limited jurisdiction, though it seems that in case of courts of coördinate jurisdiction only the record of the trial can be considered." (Ency. of Law, 2d ed., vol. 15, p. 202.)

Fifth—"If admitted that employment in some mills for the reduction of ores is unhealthful for a part or all of the workmen, and that the legislature may restrict the hours of labor, or those who may be injured, does it follow that the act will be effective as to all quartz mills and to all persons working in them, or should the court take evidence and determine in every case whether the employment is unhealthful or dangerous?" In view of the fact that if the legislative power has any right whatever to interfere with man's right to dispose of his own labor as he pleases, that right is based solely upon the police power of the state.

II. If both wet and dry-crushing quartz-mills are unhealthful in every class and phase of their employments, and therefore come within the purview of the police power of the state, we still have another class of reduction works which come under the ban of the act, and that is cyanide plants—a practically new way of reducing ores and extracting the noble metals from their matrix. The legislature, in its infinite wisdom, has placed such works in the same list with smelters.

I doubt if there was a single man in that legislature who knew anything about a cyanide plant.

III. What is the offense under the act? Is it working over eight hours in one day? Not at all. It is the injury the laborer may inflict upon the public by getting sick or getting hurt. It is because of the interest the public may have, if there is any reason for the law whatever, that the hours of employment may be regulated. The public has an interest in those only who may offend, and not in those who do not offend. If a man is healthy and following a healthful employment, the public has no interest in his work. Every person has his distinctive individuality, and the law can treat him only as an individual and judge him according to his offense.

IV. The police power of the state should be exercised only in extreme cases and when all other remedies have failed. The eight-hour law can be upheld only under the police power of the state. That fact shows that all other resources and recourses must first be exhausted before the legislature can constitutionally be permitted to pass any such law. We are passing through an industrial stage of quite general discontent on the part of employees, brought about by unpatriotic selfishness on the part of very wealthy and very powerful employers, none of whom live in Nevada. There has never been any reason for discontent in Nevada, and there was never any discontent, and none now exists in Nevada on the part of employees or on the part of employers, except such as the eight-hour law itself created. There was never any demand for such a law. It is not born of the exigencies of any case. The farmer, the employer, the mechanic, the man of family, and men who feel their responsibility, are against it, and none but the loafer, floater, and politician, who cannot see beyond the present hour, can favor it. The right of laboring men to form unions and enter into associations for their mutual protection and advantage is not questioned in the slightest degree by me. Capital or the employer has no greater or better right. Both must be limited in their rights by the basic law of the land. On that charter we must live or die.

*James G. Sweeney*, for Respondent:

POINTS AND AUTHORITIES ON SUBMISSION.

I. The court asks, first: "Can the statute under which petitioner was convicted be sustained as constitutional otherwise than as a health regulation within the police powers of the state?" I believe that it can. Under the police powers of the state I believe that it should and can be sustained, upon both the principles that such a law promotes the general welfare of the public as well as its public morals. The court, in discussing the subject of police powers, said: "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizen, and to the preservation of good order and public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, '*Salus populi, suprema lex*,' and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion may no more be bargained away than the power itself. All rights are held subject to the police power of the state. If the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer." (*Wallace* v. *The Mayor and City Council of Reno*, 27 Nev. 81.) It can also be sustained under the police power of the state, upon the ground that it tends to the preservation of good order, in repressing disturbances and maintaining public peace and tranquility. (*Ex parte Boyce*, 27 Nev. 299.)

Second—"If it can only be sustained on the ground that it is such health regulation, is the court bound by the admission of.fact in the record that the employment followed by petitioner is not unhealthful, and, if so, should the testimony taken on the hearing, subject to the objection of the attorney-general, be stricken out and disregarded?"

If it can only be sustained on the ground that it is a health-regulation statute, I emphatically answer that the court is not bound by the admission of fact in the record that the employment followed by petitioner is not unhealthful. The statute in itself is conclusive where the reasons of the legislature in enacting such a law are not unreasonable, oppressive, or in direct conflict with the constitution. I especially direct the court's attention to *Sanders* v. *Commonwealth*, 77 S. W (Ky.) 358.

There was no attempt made by the district attorney in the lower court to introduce testimony which would prove the occupation of Kair unhealthful, nor did he attempt to secure any witnesses who would so testify. The district attorney stood on the law as being conclusive. He was not bound to introduce testimony to secure the conviction of Kair other than that which would prove that he violated the law. In the Kentucky case, above referred to, the court held, there being even no evidence offered on behalf of the state, that the law in itself was conclusive. It is still my candid contention that the law can and should be sustained, not only on principles of law as set out in my answer, but also that it is a health-regulating statute under the police power of the state.

Third—"Can the court take judicial knowledge of the fact that employment in mills for the reduction of ores is unhealthful, and consequently exclude the testimony and ignore the admission of fact mentioned?"

It certainly can and should. In the Boyce case you sustained the law as being constitutional for the reason that it was a health-regulating statute, and stated that we are all aware in effect that work in mines, mills, and smelters is more or less dangerous and unhealthful, and all, save a few opposed to the law, have to admit it if they tell the truth. Having so declared, why should we be obligated to introduce testimony proving that the same is unhealthful work?

Fourth—"In how far is the court bound to conclude that employment in such mills is unhealthful because the legislature has enacted that the hours of labor therein shall be limited?"

To the extent that it is a fact, and that fact is so notori-

ously and commonly known by the public and by this court that such employment is unhealthful that it is incomprehensible to me how the court could conclude otherwise.

Fifth—"If admitted that employment in some mills for the reduction of ores is unhealthful for a part or all the workmen, and that the legislature may restrict the hours of labor of those who may be injured, does it follow that the act will be effective as to all quartz mills and to all persons working in them, or should the court take evidence and determine in every case whether the employment is unhealthful or dangerous?"

I answer no. The law in itself is conclusive. The law can and should be sustained in this case as a health regulation and also on the principles stated in my answer to the first question under the police powers of the state. It would be both impossible under the law, in my opinion, and unjust to declare the law unconstitutional as to all wet-crushing mills and men therein employed, because one man in a specific position in a single mill in this state alleges that his particular employment is not unhealthful.

By the Court, TALBOT, J.:

In the justice court at Dayton, petitioner was convicted, and sentenced to pay a fine of $100, or serve an alternative of one day for every $2 thereof in the county jail, on a charge of misdemeanor, for working more than eight hours in one day in a wet-crushing quartz-mill, contrary to the provisions of the act approved February 23, 1903, by the terms of which the period of employment of working men in underground mines, smelters, and "all institutions for the reduction or refining of ores or metals," is limited to eight hours per day, under penalty which specifies a fine of not less than $100 nor more than $500, or imprisonment in the county jail not exceeding six months, or both. (Stats. 1903, p. 33, c. 10.) Upon failure to pay the fine imposed, he was committed to the custody of the sheriff of Lyon County, and, by writ of *habeas corpus*, demands of this court his release, asserting that the statute mentioned is unconstitutional and cannot be enforced to limit his liberty to contract or to work more than

eight hours per day, under section 1 of article I of the organic
act of this state, which guarantees the right to acquire and
possess property, and that it is also in conflict with the eighth
amendment to the federal constitution, which .directs that
excessive fines and cruel and unusual punishments shall not
be imposed.

In *Ex parte Boyce*, 27 Nev. 299, 75 Pac. 1, 65 L. R. A. 47,
we had occasion to give the act in question extended consid-
eration, and held that it was constitutional, and enforceable
against one who worked longer than eight hours per day in.
an underground mine. After more mature reflection, we are
still satisfied with the reasoning and conclusions reached in
that opinion, and it is unnecessary to repeat them to any
great extent. We there held, as a matter of common knowl-
edge, that prolonged labor in the places mentioned in the
statute was injurious, and, if necessary to resort to that
power, that the legislature were warranted in passing the
act as a police or health regulation for the protection of the
men employed in those places, and the benefit to the state.
In the present case it is sought to avoid this reason or justi-
fication for the enforcement of the act by stipulation that
the occupation followed by petitioner was not injurious, and
by testimony that labor performed in wet-crushing quartz-
mills is not unhealthful, except for the men working around
pans and settlers.

Adhering to our opinion in *Ex parte Boyce*, "we are not
prepared to say that the mining, milling, and smelting of
ores are not vocations so unhealthful and hazardous that
they may not come under the protecting arm of the legisla-
ture; but to recognize these conditions, and pass laws for
their amelioration, and which may protect the health and
prolong the lives of the men so employed, we think, is within
the legitimate powers of the lawmaking branch of our gov--
ernment. If these matters were uncertain, when their exist-
ence is necessary to sustain the law the doubt should be
resolved in favor of the statute, for, as held by this court in
several decisions, its validity will be presumed until it is
clearly shown to be unconstitutional."

As applicable here, we repeat a part of the language by

the Supreme Court of Utah which we quoted in that case, and which had been adopted by the Supreme Court of the United States as a part of the decision in *Holden* v. *Hardy*, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780: "Unquestionably the atmosphere and other conditions in mines and reduction works differ. Poisonous gases, dust, and impalpable substances arise and float in the air in stamp mills, smelters, and other works in which ores containing metals combined with arsenic or other poisonous elements or agencies are treated, reduced, and refined; and there can be no doubt that prolonged effort, day after day, subject to such conditions and agencies, will produce morbid, noxious, and other deadly effects in the human system. Some organisms and systems will resist and endure such conditions and effects longer than others. It may be said that labor in such conditions must be performed. Granting that, the period of labor each day should be of a reasonable length. Twelve hours per day would be less injurious than fourteen, ten than twelve, and eight than ten. The legislature has named eight. Such a period was deemed reasonable. The law in question is confined to the protection of that class of people engaged in labor in underground mines, and in smelters and other works wherein ores are reduced and refined. This law applies only to the classes subjected by their employment to the peculiar conditions and effects attending underground mining, and work in smelters and other works for the reduction and refining of ores. Therefore it is not necessary to discuss or decide whether the legislature can fix the hours of labor in other employments. Though reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether the law is calculated or adapted to promote the health, safety, or comfort of the people, or to secure good order or promote the general welfare, we must resolve them in favor of the right of that department of government. But the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. The state still

retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety, and welfare are sacrificed or neglected, the state must suffer."

It is a matter of common knowledge that the health of. many men is impaired by labor in quartz mills. If, by taking proof that others are not injured, the statute is to be declared void or inoperative as to them, we enter a wide field of uncertainty and speculation, and, instead of having the constitutionality of the act rest upon solid ground and a sure foundation, its enforcement would become subject to the more or less speculative opinions of interested parties and others, and to the conclusions of various justice courts and juries regarding the probability of injury to men working longer or shorter periods in the places mentioned; and witnesses could testify regarding the consequences to health from labor in these employments, and thereby indirectly regarding the necessity for legislative action and the validity of the statute, in each case as it arose. If exceptions based upon such proof are to be made to the enforcement of the act, they might depend not only upon the character of the mill and the distinguishing features of the work of the various men employed, but upon the age, constitution, vitality, and probable endurance of the different employees, the ingredients used in working the ores, such as quicksilver, cyanide, or other chemicals injurious to health, the quantity and effect of dust and fumes, the character of the ores, and whether they contained lead, arsenic, or other harmful substances, from day to day, or upon other conditions and uncertainties, which would multiply litigation, and lead to doubt and difficulty in securing the benefits intended by this legislation.

Although courts should be careful not to usurp the powers delegated to the lawmaking branch of the government, and should not receive evidence regarding facts of which they are satisfied by judicial knowledge, and although all reasonable doubts should be resolved in favor of the action of the legislature and constitutionality of the statute, yet we are not prepared to say that there is any conclusive presumption

in favor of any fact essential to support the validity of the enactment as being within the police power of the state, or that the court having proper jurisdiction may not receive proof regarding any controlling fact which is in doubt. A review of the decisions indicates that the courts have acted in cases similar to the one under consideration, generally upon judicial cognizance, or, if in doubt, have accepted the judgment of the legislature or received proof.

Chief Judge Parker, speaking for the court in *People* v. *Lochner*, 177 N. Y. 145, 69 N. E. 373, in an opinion filed one day after ours in the Boyce case, reviewed many of the authorities, pointed out the wide scope of the police power which the federal supreme court has often held to be vested in the legislatures of the various states, notwithstanding the fourteenth amendment, cited with approval *People* v. *Havnor*, 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707, which upholds an act regarding barber shops, and found, as a matter of judicial knowledge, that work in bakeries and confectioners' establishments was unhealthful, and for that reason sustained the New York statute restricting the hours of labor in those places.

Twenty days after the filing of the opinion in *Ex parte Boyce*, and before publication of it had likely reached there, the Supreme Court of Missouri, after a careful consideration of the authorities—the case being on appeal—held that the act limiting labor to eight hours a day in underground mines in that state was constitutional; that the validity of the statute could not be made dependent upon the opinions of experts as to the necessity for such enactment; and that the testimony of physicians, mining engineer, and foreman, and of one who had worked thirty-four years in the mines, could not be received to prove that such underground work was not more injurious to health than laboring the same number of hours on the surface. Justice Fox (all the justices concurring) said: "Defendants sought to introduce testimony of expert witnesses tending to show that the underground work contemplated by this act of the legislature was not attended with danger to the health of those engaged in the performance of such work. This testimony was excluded by the court, and,

in our opinion, correctly so. The validity of laws enacted in the exercise of the police power of the state cannot be made dependent upon the views of experts as to the necessity of such enactment. If the constitutionality of all laws enacted for the promotion of public health and safety can be assailed in this manner, truly and sadly would it be declared that our laws rest upon a very weak and unstable foundation." (*State* v. *Cantwell*, 179 Mo. 245, 78 S. W. 569.)

In *Powell* v. *Pennsylvania*, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253, plaintiff in error was convicted and fined $100 for selling packages of an article of food marked "Oleomargarine Butter," under a statute of that state prohibiting the manufacture out of oleaginous substances, or out of any compound thereof other than that produced from unadulterated milk or cream, of any article designed to take the place of butter or cheese, and making it unlawful to sell the same. On the trial the accused offered to prove that the article was made from pure animal fat; that the process of manufacture was clean and wholesome—the article containing the same elements as dairy butter, the only difference between them being that the manufactured article contained a smaller proportion of the fatty substance known as "butterine"; that the only effect of butterine was to give flavor to the butter, and that it had nothing to do with its wholesomeness; that the article sold to the prosecuting witness was a nutritious article of food, in all respects as wholesome as butter produced from pure unadulterated milk or cream; that, for the purpose of manufacturing and selling this oleomargarine, he had invested large sums in real estate, machinery, and ingredients; that in his traffic in this article he made large profits, and, if prevented from continuing it, the value of his property employed therein would be entirely lost, and he be deprived of the means of livelihood. The rejection of this proof by the trial court, and the conviction and judgment against the accused, were sustained by the supreme courts of that state and of the United States; and Justice Harlan, in delivering the opinion for the latter tribunal, said: "It will be observed that the offer in the court below was to show by proof that the particular article the defendant sold

and those in his possession for sale, in violation of the stat-
ute, were in fact wholesome or nutritious articles of food. It
is entirely consistent with that offer that many—indeed, that
most—kinds of oleomargarine butter in the market contain
ingredients that are or may become injurious to health. The
court cannot say, from anything of which it may take judi-
cial cognizance, that such is not the fact. Every possible
presumption, Chief Justice Waite said, speaking for the court
in *Sinking Fund Cases*, 99 U. S. 700, 718, 25 L. Ed. 496, is in
favor of the validity of the statute, and this continues until
the contrary is shown beyond a rational doubt. One branch
of the government cannot encroach on the domain of another
without danger. The safety of our institutions depends in
no small degree on a strict observance of this salutary rule
See, also, *Fletcher* v. *Peck*, 6 Cranch, 87–128, 3 L. Ed. 162
*Dartmouth College* v. *Woodward*, 4 Wheat. 518–625, 4 L. Ed.
629; *Livingston County* v. *Darlington*, 101 U. S. 407, 25 L.
Ed. 1015 * * * And as it does not appear upon the
face of the statute, or from any facts of which the court
must take judidicial cognizance, that it infringes rights
secured by the fundamental law, the legislature's determi-
nation of those facts is conclusive upon the courts. It is not
a part of their functions to conduct investigations of facts
entering into questions of public policy, merely, and to sus-
tain or frustrate the legislative will embodied in statutes, as
they may happen to approve or disapprove its determination
of such questions. If all that can be said of this legislation
is that it is unwise or unnecessarily oppressive to those manu-
facturing or selling wholesome oleomargarine as an article
of food, their appeal must be to the legislature or to the
ballot box, not to the judiciary. The latter cannot interfere
without usurping powers committed to another branch of
government."

Laws restricting the hours of labor in some form have
been enacted in many of the states, and these statutes, when
relating to vocations that affect the health or safety of the
people employed, have generally been sustained by the courts
as not in conflict with state or federal constitution, except in
Colorado.

Aside from these cases in the Supreme Courts of the United States and of Utah and Missouri sustaining similar enactments directly limiting the hours of labor in places named in our statute, there are many able decisions maintaining this general doctrine, and upholding various acts similar in principle, among which are the vigorous opinion by Justice Field in *Ex parte Newman*, 9 Cal. 518, later adopted by the court in *Re Andrews*, 18 Cal. 685, and the numerous cases cited in *People* v. *Havnor; State* v. *Cantwell; Ex parte Northrup*, 41 Or. 490, 69 Pac. 445; *State* v. *Petit*, 74 Minn. 379, 77 N. W. 225; *Ex parte Boyce*, 27 Nev. 299; *Sanders* v. *Com.* (Ky.) 77 S. W. 358; *Butler* v. *Chambers*, 36 Minn. 71, 30 N. W. 308, 1 Am. St. Rep. 638; *People* v. *Bellet*, 99 Mich. 151, 57 N. W. 1094, 22 L. R. A. 696, 41 Am. St. Rep. 589; *Munn* v. *Illinois*, 94 U. S. 113, 24 L. Ed. 77.

The decisions in California and New York holding statutes that limit labor on public works to eight hours to be unconstitutional are not considered applicable here, because such employment was not claimed to be unsafe or injurious to health. These cases are not only overthrown by *Atkin* v. *Kansas*, 191 U. S. 207, 24 Sup. Ct. 124, 48 L. Ed. 148, but by the very principle advanced to sustain them, for, if liberty of action and freedom of the individual to contract are to control when the employment is not unsafe or unhealthful, certainly the state ought to have the same right to regulate the terms and conditions in its own contracts and those of its municipalities as is accorded to individuals.

If we were not satisfied, as a matter of common knowledge, that prolonged labor in the employment restricted by the statute is injurious to the health of the workmen as a class, we would determine regarding the admissibility of evidence in this connection to enlighten the court and control the judgment and act of the legislature; but, being so satisfied, we do not deem it expedient to allow testimony in particular or exceptional cases to defeat the constitutionality of the act. It is not difficult to distinguish between employments which in principle are not unhealthful or injurious, as a class, and those which are, and a statute relating to the latter ought not to be nullified or rendered uncertain in its operation

because some of the employees may possibly be exempt from injury. If the enforcement of the statute depended upon proof of injury to the workmen in every case, it could be contended that the justice court would have power on the trial to hear the evidence and determine the fact; and, having jurisdiction, if it erred in finding or failing to find, or in accepting or rejecting, proof, its action would be reviewable on appeal, and not on a writ of *habeas corpus*, which would be a proper remedy if the act were entirely void, and its invalidity not dependent upon varying proofs in different cases. (*Ex parte Edgington*, 10 Nev. 215; *Ex parte Crawford*, 24 Nev. 91, 49 Pac. 1038; *Ex parte Allen*, 12 Nev. 87; *Ex parte Bergman*, 18 Nev. 331, 4 Pac. 209; *Ex parte Kitchen*, 19 Nev. 178, 18 Pac. 886; *Ex parte Maxwell*, 11 Nev. 429; *Ex parte Winston*, 9 Nev. 71; *In re Peraltareavis* (N. M.) 41 Pac. 538; *Ex parte Le Roy* (Okl.) 41 Pac. 615; *In re Black* (Kan.) 34 Pac. 414, 39 Am. St. Rep. 331; *Ex parte Adams* (Ark.) 28 S. W. 1086; *In re Rosenberg* (Wis.) 63 N. W. 1065; *Ex parte Belt*, 15 Sup. Ct. 987, 40 L. Ed. 88; *State* v. *Noyes* (Wis.) 58 N. W. 386, 27 L. R. A. 776, 41 Am. St. Rep. 45; *Ex parte Perdue* (Ark.) 24 S. W. 423.)

Naturally enough, many of the most ardent opponents of any limitation to the time for labor in unhealthful or unsafe pursuits are actuated more by anxiety to profit by the long hours of toil of others, than by any desire to labor so long themselves, while some of the world's most eminent minds have favored such limitation. Before the invention of many of the most ingenious labor-saving devices with which we are blessed to-day, and consequently when the effort required to support the world was much greater per capita than now, our ever-esteemed patriot, statesman, and philosopher, Franklin, proclaimed that, by the proper or equal distribution of labor, no one would need to toil one-half so long as the time for which petitioner contends. President Harrison, in his annual messages of 1889, 1890, 1891, and 1892, urged upon Congress the necessity of requiring appliances to prevent injuries in the coupling and braking of cars engaged in interstate commerce, and legislation to that end was sustained recently by the Supreme Court of the United

States in *Johnson* v. *Southern Pacific Company*, 196 U. S. 1, 25 Sup. Ct. 158. Count Tolstoi favors the reduction in the hours of labor for employees in factories and mills, and President Roosevelt, in his message to Congress last December, advocated a restriction in the hours for trainmen. While Governor of New York he recommended and signed a bill which made an eight-hour day for the employees of that state. He and Presidents Grant, Cleveland, and McKinley favored the limitation to eight hours of labor on government works.

The fact that the vocations mentioned in the statute, including the one of milling ores, are injurious to the health of many of the men following them, if not to some extent to all, justified the action of the legislature; and we think that, in order to give due effect to its terms, it should be enforced against all coming within the classes specified.

The defendant is remanded to the custody of the sheriff of Lyon County.

Fitzgerald, C. J.:

I concur in the result stated in the foregoing opinion, and my reasons therefor will hereafter be filed.

This case having been submitted during the October term, Norcross, J., did not participate.