STATE OF IOWA, Appellee, v. THE ARMOUR PACKING CO., Appellant.

Pure food: SALE OF OLEOMARGARINE: CONSTRUCTION OF STATUTES.
1  Code, sections 2516–17–18, when construed together, prohibit the sale of oleomargarine, which is the color of butter made from pure milk or cream, even though it contains no ingredient the sole function of which is coloration.

Expert testimony. The question of whether a product intended as a
2  substitute for butter, bears the color of pure butter, is not one of expert testimony.

Sale of oleomargarine: CONSTITUTIONALITY. The statutes regulating
3  the sale of substitutes for pure butter are not unconstitutional, in that they amount to a virtual prohibition of the sale of a legitimate article of commerce and a wholesome food product, thus interfering with the natural rights of man.

*Appeal from Polk District Court.*— HON. W. H. McHENRY, Judge.

FRIDAY, JUNE 10, 1904.

INDICTMENT for the sale of a product in imitation of butter. Judgment of conviction, and the defendant appeals. — *Affirmed.*

*Carr, Hewitt, Parker & Wright,* for appellant.

*Charles W. Mullan,* Atty. Gen., *Lawrence De Graff,* Asst. Atty. Gen., *Jesse A. Miller,* and *J. J. Halloran,* for the State.

DEEMER, C. J.— The indictment charges a sale by the defendant of a substance or compound made in the semblance of, designed for and intended to be used in the place of, and as a substitute for, butter, which said substance or compound was not produced from pure milk and cream, although bearing a yellow color in resemblance of true dairy products. The evidence showed a sale by the defendant of a tub or firkin of oleomargarine. The buyer knew what he was purchasing, and the tub was sealed, labeled, and marked in every particular as required by statute with reference to the sales of substitutes for butter; but the product itself bore a yellow color in imitation of butter. The theory on which the case was tried is fully shown in one of the instructions given by the trial court, which we here reproduce: " You will observe that the charge in the indictment is not for coloring imitation butter, nor for selling it without its being marked as required, but it is for unlawfully selling it, it having a yellow color. The statute, as applied to this charge, prohibits the selling of imitation butter, or substitute for butter, having a yellow color. The words ' yellow color,' here used, mean the natural yellow color of butter made from milk or cream from cows, without any coloring matter having been added thereto. If

you find that the defendant is a corporation, and that it sold the firkin and contents introduced in evidence as 'Exhibit A' to H. R. Wright, and if you find the same is imitation butter, or substitute for butter, you will then determine whether or not it is of a yellow color, as herein defined to you; and this you will determine from your own knowledge, experience, or observation, whether the contents of the firkin of imitation butter or substitute for butter in evidence is of a yellow color — that is, of the natural yellow color of butter made from milk or cream from cows.   And if you so find, your verdict will be 'Guilty'; otherwise it will be 'Not guilty.'"

The statutes material to our inquiry read as follows:

Section 2516.   Every article, substitute or compound, save that produced from pure milk or cream from milk cows, made in the semblance of, or designed to be used for and in the place of butter, is imitation butter;   *   *   *   no one shall manufacture, have in possession, offer to sell or sell, solicit or take orders for delivery, ship, consign or forward by any common carrier, public or private, and no common carrier shall knowingly receive or transport any such imitation butter,   *   *   *   except in the manner and subject to the regulations in this chapter provided.

Section 2517.   A substitute for butter or cheese, not having a yellow color, nor colored in imitation of butter and cheese as prohibited in the next section, may be manufactured, kept in possession, offered for sale, sold, shipped, consigned or forwarded by common carrier   *   *   *   if each tub, etc.

Section 2518.   No one shall color with any matter whatever any substance intended as a substitute for butter or cheese, so as to cause it to resemble true dairy products, or combine any animal fat, vegetable oil or other substance, with butter or cheese or combine with any substance whatever, intended as a substitute for butter or cheese, anything of any kind or nature, for the purpose or with the effect of imparting to the compound the color of yellow butter or cheese, the product of the milk or cream from cows, or use, solicit orders for delivery, keep for sale, or sell, any such substance so colored, and designed as a substitute for butter or cheese.

The first contention made in argument is that these statutes must be construed together, and that, when so construed, it will be found that they do not apply to traffic in pure unadulterated oleomargarine, but should be held to prohibit the combining of any coloring matter or ingredient with the compound for the purpose of making it resemble butter made from pure milk or cream. Pursuant to this theory, the defendant offered to show that the compound sold by it contained nothing but ingredients which are used in making oleomargarine; that the coloration was due to the presence of natural ingredients necessarily used in the making of the product, and that nothing was placed therein for the purpose of coloring the compound and to give it the resemblance of yellow butter, and nothing added thereto except essential and necessary ingredients of the article known to commerce as " oleomargarine." Objections to this line of testimony offered by the State were sustained, and this necessarily presents the question of the true construction of these statutes. Defendant also offered to prove by an expert that the product sold by it did not bear the color of yellow butter. The State's objection to this was also sustained. A careful examination of the statutes quoted leads us to the conclusion that the Legislature not only intended to prohibit the coloration of any substance intended as a substitute for butter, but also to prohibit the sale of any compound made in the semblance of, or designed to be used for and in the place of butter, which bore a yellow color in imitation of that produced from pure milk or cream of cows. But it permitted the sale of such an article of commerce or compound under certain restrictions, so long as it did not bear the color of, or was not colored in imitation of pure butter. The sale of imitation butter bearing the yellow color of butter made from pure milk or cream is absolutely prohibited; and it is also made an offense for any one to color any substance intended as a substitute for butter so as to cause it to resemble the true dairy product, or to solicit orders for, keep for sale,

1. SALE OF OLEO-MARGARINE: construction of statutes.

or sell any substance so colored.   This is the only reasonable construction of these statutes.   Any other convicts the Legislature of an unnecessary use of words to define a very simple prohibition.   Indeed, it is impossible to arrive at any other conclusion, without reading out of these statutes words and sentences which ordinarily would be very plain.   There is little room for doubt as to the legislative intent.   Moreover, we may well assume that the General Assembly had in mind such a possible state of affairs as was here attempted to be shown.   The books say that originally pure oleomargarine was almost white in color.   Without the introduction of pure butter or coloring matter, the product would be almost white, as we understand it.   It was entirely possible to introduce into the product innocuous coloring matter, which would give it the hue of butter, and then to claim, just as was here attempted to be proved, that this coloring matter or substance was a necessary ingredient of the compound and essential to the product known to commerce as " oleomargarine "; and this, in a sense, would doubtless be true.   Under such a state of facts it might well be claimed that nothing was introduced into the substance for the purpose of giving it the color of butter.   Were such a contention to receive judicial approval, it is manifest that many difficulties would arise in the enforcement of the law.

Looking to the history of this product as contained in standard works of well-recognized authority, it is apparent to our minds that, whatever the present purpose, the original thought was to make oleomargarine so closely resemble butter that the buyer or consumer could not tell the difference, and in the end to increase the sale of the product to the prejudice of pure butter.   It may be that, if both were natural products, the Legislature could not single out one at the expense of the other; but it surely had power to prevent the sale of a manufactured product, which is made to so resemble another as that the buyer or actual consumer might be deceived thereby, and induced to buy and to eat a substance which he would

not otherwise have bought or used. The primary object of all such legislation is to secure pure food, and to prevent fraud, deception, and deceit. The sale of oleomargarine is not wholly prohibited by these acts. The only prohibition is against its sale when made in imitation of butter. The manufacturer is not compelled to color it, as he was by the statutes construed in *Collins v. New Hampshire,* 171 U. S. 30 (18 Sup. Ct. 768, 43 L. Ed. 60). Our statutes differ from those there construed in that they do not provide for adulteration, but simply say that the maker shall not so manufacture it as that it bears the yellow color of pure butter, or color with any matter whatsoever any substance intended as a substitute for butter so as to cause it to resemble the true dairy product. It does not provide for the introduction of any coloring matter, but prohibits it so long as that matter is introduced for the purpose of giving the compound the yellow color of true butter. Remembering that oleomargarine is a manufactured product, made of oleo oil, neutral lard, milk and cream, and pure butter, although pure butter is not used in all grades, and that butter and milk and cream or other coloring matter is evidently used for the purpose of giving it the semblance of the true dairy product, it is manifest, we think, that the Legislature may so control its manufacture and sale as to provide that no coloring matter shall be introduced for the purpose of securing a similitude of the true product. It was this which the Legislature aimed at in enacting the law in question. This being true, there was no error in the instruction given, unless it offends against some constitutional provision; nor in the rulings on the rejection of evidence to which we have heretofore made reference.

The question propounded to the expert as to whether or not the substance sold bore the yellow color of true butter was not a matter of expert evidence. The law was not enacted for 2. EXPERT TESTIMONY. experts, but for the common people, who might be deceived by the appearance of the substitute, and led to purchase something they did not want. Moreover,

the product itself was introduced in evidence, and was before the jury. Every one is presumed to know the color of an article which is in such general use as butter, and as to whether or not an article intended as a substitute therefor bears the yellow color of true butter. The case differs materially from *Williams v. Brooks,* 50 Conn. 285 (47 Am. Rep. 642), relied upon by the appellant. That was a copyright case, and there was no statute absolutely prohibiting the use of the article. The question there was one of actual fraud. Here there is no question of actual fraud. Liability to fraud and deceit was the fundamental thought in the mind of the Legislature; but the question of deceit in the sale in controversy is not involved.

II.   There is but one question left, and that the constitutionality of these statutes so construed. Defendant contends that, so interpreted, they are unconstitutional, in that

3. SALE OF OLEO-MARGARINE: constitutionality of statutes.

they amount to a virtual prohibition of the sale of a legitimate article of commerce and a wholesome article of food; such being an interference with the natural rights of man, and a violation of the privileges secured to him both by the State and the federal Constitutions. The propositions thus presented are not new to the courts. The Supreme Court of the United States, as well as the highest courts in other jurisdictions, have held statutes absolutely prohibiting the sale of oleomargarine constitutional. See *Powell v. Penn.,* 127 U. S. 678 (8 Sup. Ct. 992, 1257, 32 L. Ed. 253) ; *State v. Addington,* 77 Mo. 118; *Powell v. Com.,* 7 Atl. Rep. 913 (60 Am. Rep. 350) ; *Com. v. Huntley,* 156 Mass. 236 (30 N. E. Rep. 1127, 15 L. R. A. 839) ; *Cook v. State,* 110 Ala. 40 (20 South. 360) ; *Palmer v. State,* 39 Ohio St. 236 (48 Am. Rep. 429) ; *People v. Arensberg,* 105 N. Y. 123 (11 N. E. Rep. 277, 59 Am. Rep. 483) ; *State of Ohio v. Capital City Co.,* 62 Ohio St. 350 (57 N. E. Rep. 62, 57 L. R. A. 181) ; *State v. Bockstruck,* 136 Mo. 335 (38 S. W. 317) ; *Capital City Co. v. Ohio,* 183 U. S. 238 (22 Sup. Ct. 120, 46 L. Ed. 171). See also, *State v. Schlenker,*

112 Iowa, 642; *Butler v. Chambers,* 36 Minn. 69 (30 N. W. Rep. 308, 1 Am. St. Rep. 638); *Weideman v. State,* 55 Minn. 183 (56 N. W. Rep. 688). It will be observed that the statutes in question do not absolutely prohibit the sale of oleomargarine, or any other manufactured product, except it be made in the semblance of or having the yellow color of true butter; and no claim is made that oleomargarine cannot be properly manufactured without introducing coloring material so that it will not bear this yellow hue. Indeed, as already suggested, we understand that the original product was nearly white. We may therefore leave out of consideration the thought, so diligently and ably argued, that the statutes in question absolutely prohibit the sale of oleomargarine. The idea which underlies the statute in question is the prevention of fraud or deceit; in other words, it is regulation, rather than prohibition. That the Legislature has power to regulate the manufacture and sale of articles of food, even though the right to so manufacture and sell be called a natural right, is so well established as not to require the citation of authorities. But see *Jordan v. Dayton,* 4 Ohio, 295; *Gundling v. Chicago,* 177 U. S. 183 (20 Sup. Ct. 633, 44 L. Ed. 725); *State v. Rogers,* 95 Me. 94 (49 Atl. Rep. 564, 85 Am. St. Rep. 395). Such legislation is sustained on the theory that it is not practicable, by any ordinary inspection, for the purchaser or consumer to distinguish the genuine from the artificial product; and the only effective means of protecting the public against deception is to be found in the absolute suppression of the business, or such regulation thereof as will secure practically the same results. The police power is very broad, and so elastic that no comprehensive definition has ever been attempted. Of necessity, this must be so, for it must ever respond to such social conditions " as an advancing civilization of a highly complex character requires." Anything which legitimately tends to promote public morals, health, or security is within its scope; and courts should not too closely scrutinize legislative acts, bottomed on this power. Primarily, it is for that

department of government to determine what acts are or may be productive of fraud or deceit, and what inhibitions will best secure the public health and safety. But the question is not wholly legislative in character. Such acts are subject to review by the court, and the securities guaranteed by the Constitution must be preserved. Yet in all such controversies there is a broad presumption in favor of the exercise of the power, and courts should only interfere when the acts are palpably in contravention of some constitutional provision. We do not think the act in question offends against any constitutional guaranty. In an opinion written by Mr. Justice White, of the Supreme Court of the United States, which was concurred in by the entire court, an act of the State of Ohio, very similar to the one now before us, was sustained, and previous cases from the same court were cited with approval. So much has been written on the subject, and the cases are so harmonious, that we need not attempt to add anything further to what has already been said. The only case which seems to support defendant's contention is *People v. Marx,* 99 N. Y. 377 (2 N. E. Rep. 29, 52 Am. Rep. 34). But in that case the statute absolutely prohibited the sale of oleomargarine. A statute somewhat like the one in question was afterward sustained by the same court in *People v. Arensburg, supra.* The commerce clause of the federal Constitution is in no way involved in this controversy. That was eliminated by an act of Congress passed May 9, 1902, chapter 748, 32 Stat. 193 (U. S. Comp. St. Supp. 1903, page 265).

Some question is made regarding the sufficiency of the indictment, and one or two other points are made in argument which have not been separately considered. They are each and all disposed of by what has already been said, and need not be further noticed.

It follows that there is no error in the record of which defendant may justly complain, and the judgment is AFFIRMED.