OF THE

## STATE OF IOWA

AT

DES MOINES, SEPTEMBER, 1914, AND JANUARY, 1915, TERMS,

AND IN THE SIXTY-EIGHTH AND SIXTY-NINTH YEARS OF THE STATE.

---

\* STATE OF IOWA, Appellant, v. HUTCHINSON ICE CREAM COMPANY et al., Appellees.

**CONSTITUTIONAL LAW:** Legislative Acts—Title—Sufficiency—
1 **Rule.** The title of a legislative act, even though expressed in general terms, meets every requirement of the Constitution (Sec. 29, Art. 3) if it reasonably answers as a key to the subject-matter of the act. Details of the act or reasons for its passage need not be stated in the title. In instant case, the title of the act fixing a standard for ice cream is held to comply with the Constitution.

PRINCIPLE APPLIED: Sec. 4999-a31, Sup. Code, 1907, established certain *food standards* for some twenty different articles of food. Later, this section was amended by Chap. 175, Acts

---

\* (This opinion ought to have appeared in Volume 165, but by reason of an oversight it was not delivered to the former Reporter.)

34th General Assembly, by adding thereto a standard for ice cream. The title of said chapter was: ''An act to amend section 4999-a31 of the supplement to the code, 1907, relating to food standards.'' *Held*, (a) the subject-matter of the amendment was germane to the section amended and (b) the ''subject'' of the act was sufficiently stated in the title.

CONSTITUTIONAL LAW: Police Power—''Due Process''—Interference with Lawful Business—Prevention of Fraud and Deception—Ice Cream Standard Act. The Ice Cream Standard Act (Sec. 4999-a31, Sup. Code, 1913) declaring 12 per cent. butter fat as the standard for ice cream and prohibiting the sale of anything else as ice cream, but not prohibiting the sale of other wholesome frozen milk or cream compounds inferior to said standard if sold other than 'as ice cream, provides no unwarranted interference with the lawful business of manufacturing ice cream, because said act is within the police power of the state as a reasonable measure fairly tending to remove the mere opportunity for fraud and deception, and consequently having fair relation to the comfort, safety and welfare of the public. Said act is not, therefore, in violation of the ''due process'' clause of either the national or state Constitution.

CONSTITUTIONAL LAW: Presumption of Constitutionality—Reluctance to Overthrow Act—Privilege to Defraud—State of Facts Justifying Act. The following premises are laid down in instant case:

1. There is a presumption that a legislative act is constitutional.

2. A legislative act will be declared unconstitutional only when the act is clearly, palpably, plainly and beyond a reasonable doubt in violation of the Constitution.

3. The Constitution does not secure to anyone the privilege of defrauding the public.

4. If, under any possible state of facts, an act would be constitutional, the court is bound to presume that such condition existed; and whether such state of facts does exist is for the legislature alone to determine.

CONSTITUTIONAL LAW: State of Facts Justifying Law—Judicial Knowledge. On the question whether a statute is so manifestly arbitrary and unreasonable as to necessitate a judicial declaration of its unconstitutionality, the court will take judicial knowledge of matters of fact of more or less notoriety and presumptively within the knowledge of the legislature. In instant case, involving the constitutionality of an act declaring a standard for ice cream, it is not stated just how far the court will take judicial

knowledge of such matters, but under agreement of the parties, there were considered matters of opinion and fact embodied in (a) public reports, (b) trade journals, (c) cookbooks and (d) circulars.

**STATUTES:** Construction—**Absolute or Qualified Prohibition on Sale—Ice Cream Standard Act.** The Ice Cream Standard Act (Sec. 4999-a31, Sup. Code, 1913) does not prohibit the sale and keeping for sale of wholesome frozen milk and cream products below the statutory standard, if sold not as ice cream, but by some other name and for what it really is.

*Appeal from Polk District Court.*—HON. W. H. MCHENRY, Judge.

TUESDAY, MAY 12, 1914.

TWO informations were filed by a state food and dairy commissioner before a justice of the peace in the two cases, one against the Hutchinson Ice Cream Company and C. J. Hutchinson, Manager, and the other against Sanders Ice Cream Company and L. R. Sanders, President.

The defendants were accused of the crime of selling, exchanging, delivering, and having in possession with intent to sell, exchange and expose and offer for sale and exchange, adulterated food, in violation of Chapter 166, Laws of the 31st General Assembly, as amended (Supp. to the Code, Secs. 4999-a15 to 4999-a43), for that the defendants did have in possession, with intent to sell, exchange and expose and offer for sale and exchange, and did sell, exchange and deliver a certain food product called ice cream, which was adulterated, in that it did not conform to the standards established by law, being deficient in butter fat, etc.

Demurrers were interposed by the defendants on the following grounds:

First. The acts charged as constituting the offense charged constitute no crime under the statutes upon which the prosecution is based, i. e., Chapter 166, Laws of the Thirty-First General Assembly, Secs. 4999-a15 to 4999-a43.

Second. If the prosecution is claimed to be based in any respect upon the provisions of Chapter 175, Acts of the Thirty-Fourth General Assembly, said act of the Thirty-Fourth General Assembly is unconstitutional and void in view of Sec. 29, Art. 3, of the Constitution of Iowa, which provides that every act shall embrace but one subject, which shall be expressed in its title; moreover, said act provides no penalty and, being a separate act, is not included within the prohibition of Secs. 4999-a15 to 4999-a43, Supplement to Code.

Third. The legislature had no power to fix the standard of butter fat in ice cream at 12 per cent because: (a) Said standard and the statute fixing the same are unreasonable. (b) It invades the individual rights of defendant and is not a mere police regulation having no relation in fact to the comfort, safety and welfare of the public. (c) Said statute is in violation of Sec. ——, Art. ——, of the Constitution of the State of Iowa, in that it arbitrarily interferes with personal liberty and private property without due process of law, having in fact no relation to the public health, comfort or welfare. (d) That said statute is in violation of Section 1, Fourteenth Amendment to the Constitution of the United States, in that it arbitrarily interferes with personal liberty and private property without due process of law, having in fact no relation to the public health, comfort or welfare.

The demurrers were overruled by the justice, evidence was taken, and the defendants were found guilty. An appeal was taken to the district court, where the demurrers were again interposed and sustained. The state appeals. The cases are submitted together.—*Reversed.*

*George Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, *O. S. Thomas,* Special Counsel, *Thomas J. Guthrie,* County Attorney, *George A. Wilson,* Assistant County Attorney, for appellant.

*Hager & Parrish* and *Walter Jeffreys Carlin,* for appellees.

PRESTON, J.—I. One of the objections to the statute on which this prosecution is based is that the act is invalid for noncompliance with Sec. 29, Article 3, of the Constitution of Iowa, in that its subject was not expressed in the title. This constitutional provision, or that part of it relating to the points raised in this case, is that, "Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title."

Chapter 166, Acts of the Thirty-first General Assembly (Code Supp., Secs. 4999-a15 to 4999-a30), was an act to prevent the adulteration of foods, etc. This was amended by Chapter 178, Acts of the Thirty-second General Assembly, by adding at the end of Chapter 166, section 18 (now appearing as 4999-a31 of the Supplement to the Code), relating to food standards, which establishes standards for certain articles therein enumerated. That section (4999-a31) was amended by Chapter 175 of the Thirty-fourth Session of the legislature, the act in question, and fixes a standard for ice cream, in addition to the other articles for which the standard had been fixed in 4999-a31. The title to Chapter 175, just referred to, is: "An act to amend section four thousand nine hundred and ninety-nine-a thirty-one (4999-a31) of the supplement to the code, 1907, relating to food standards."

The provisions of the act establishing an ice cream standard, after the enacting clause, are:

"1. *Ice-cream.* Ice-cream is the frozen product made from pure wholesome sweet cream and sugar, with or without flavoring, and if desired, the addition of not to exceed one per cent. (1%) by weight of a harmless thickener, and contains not less than twelve per cent. (12%) by weight of milk fat, and the acidity shall not exceed three-tenths (3-10) of one per cent. (1%).

"2. *Fruit ice-cream.* Fruit ice cream is the frozen product made from pure wholesome sweet cream, sugar, and sound, clean, mature fruits, and, if desired, the addition of not

to exceed one per cent (1%) by weight of a harmless thickener, and contains not less than ten per cent. (10%) by weight of milk fat.

"3. *Nut ice cream.* Nut ice cream is the frozen product made from pure wholesome sweet cream, sugar, and sound, non-rancid nuts, and, if desired, the addition of not to exceed one per cent. (1%) by weight of harmless thickener, and contains not less than ten per cent. (10%) by weight of milk fat."

Some of the other provisions of these statutes, which have some bearing upon the points argued will be here referred to.

Section 4999-a20 provides in part that:

"No person, firm or corporation, by himself, officer, servant or agent, or as the officer, servant, or agent of any other person, firm or corporation, shall manufacture or introduce into the state, or solicit or take orders for delivery, or sell, exchange, deliver or have in his possession with the intent to sell, exchange or expose or offer for sale or exchange, any article of food which is adulterated or misbranded, within the meaning of this act."

Section 4999-a21 provides in part:

"The word 'food,' as herein used, shall include all articles used for food, drink, confectionery or condiment, by man or domestic animals, whether simple, mixed or compound."

Section 4999-a22 defines adulteration and states in part that:

"For the purpose of this act an article of food shall be deemed to be adulterated:

"First. If any substance or substances has or have been mixed and packed with it so as to reduce or lower or injuriously affect its quality, strength or purity.

"Second. If any substance or substances has or have been substituted wholly or in part for the article.

"Third. If any valuable constituent of the article has been wholly or in part abstracted.

"Fourth. If it be an imitation of, or offered for sale, under the specific name of another article, or if it does not conform to the standards established by law."

The purpose of the constitutional provision contained in Sec. 29, Art. 3, was, as stated in some of the cases, to prohibit the insertion in an act of incongruous matter having no connection or relation with the general subject as expressed in the title. It has been held that the title is sufficient, although confined to general terms, if it answers as a key to the subject-matter of the act. *Sisson v. Board,* 128 Iowa 442, 452; *State v. Fairmont Creamery Co.,* 153 Iowa 702, 715.

1. CONSTITU-
TIONAL LAW:
legislative
acts: title:
sufficiency:
rule.

It is not necessary that the details of the subject-matter or reasons which brought about the enactment by the legislature should be set out in the title. If it refers in a general way to the subject and is reasonably germane, and calculated to advise the members of the legislature and the people of the nature of the pending legislation or changes in the laws by amendment, it is sufficient. The requirement that the act shall embrace but one subject, and matters properly connected therewith, was intended to prevent the evils of omnibus bills and surreptitious legislation. It is not claimed in this case that the act in question does contain more than one subject,-but that the subject is not expressed in the title. This, of course, must be done, under the terms of the provisions, at least to the extent already indicated. The authorities seem to agree that such provisions are to be given a reasonable construction. As some of them state it, they should be construed liberally to uphold proper legislation, all parts of which are reasonably germane, on the one hand, and to prevent trickery on the other.

Appellees rely on *State v. Bristow,* 131 Iowa 664. In the *Fairmont Creamery Case, supra,* it was shown that in the

*Bristow Case* there was nothing in the title to indicate the contents of the act; that the title related only to the act which was repealed, and did not refer to the act which was a substitute for the act which was repealed. Section 4999-a31 established standards of more than twenty articles. The essential subject was food standards. The act in question is amendatory to section 4999-a31, and the title recites that it is "An act relating to food standards."

The act in question adds ice cream to the list for which standards had already been established. In our opinion, it was germane, and the act does not offend against the constitutional provision quoted. The point is ruled by the holding in *McGuire v. Railway*, 131 Iowa 340, 346, and the *Fairmont Creamery Company Case, supra*. See also, *Santo v. State*, 2 Iowa 165; *State v. County Judge*, 2 Iowa 280; *Morford v. Unger*, 8 Iowa 82; *Davis v. Woolnough*, 9 Iowa 104; *Porter v. Thomson*, 22 Iowa 391; *Martin v. Blattner*, 68 Iowa 286; *Christie v. Ins. Co.*, 82 Iowa 360; *Iowa Association v. Selby*, 111 Iowa 402.

2. The principal point in the case is whether the act in question, fixing a standard for ice cream, is within the police power of the state. The contention of defendants, as they state it, is substantially that the act is not within the police powers of the state, for that it in fact has no relation to the comfort, health and welfare of the public, and hence violates both the state and federal constitutions by interfering with the personal liberty and private property of the citizen, without due process of law; that it is arbitrary, unreasonable and an unwarranted interference with a lawful business, depriving manufacturers of ice cream of property rights of great value, and depriving both manufacturers of ice cream and the people of their liberty.

2. CONSTITUTIONAL LAW: police power: "due process": interference with lawful business: prevention of fraud and deception: ice cream standard act.

The contention of the state is, in substance, that the act is clearly within the police power of the state, and hence does

not offend against the federal or state constitution, unless it has no reasonable relation to the purposes which it is designed to effect. It is conceded by the state that, to be a valid exercise of such power, the act must have relation to the comfort, safety or welfare of the public; but that the welfare of the public involves or includes the right of the legislature to protect the public from fraud and deception; that the constitution does not secure to anyone the privilege of defrauding the public; that it is impossible for consumers of ice cream to determine by any ordinary diligence the ingredients of the product; and that, without a standard, opportunity is afforded unscrupulous manufacturers of ice cream to palm off upon the public a much cheaper and inferior article for a higher quality at the price of the better and more costly product.

There seems to be no serious controversy between counsel for either side in regard to many of the fundamental propositions of law involved, but they agree that the difficulty lies in their application. Defendants concede the validity of the police power in its fullest extent; admit that it is within the power of the legislature to enact laws for the purpose of preventing fraud in the sale of food products; that ordinarily the propriety of passing an act of this character is a question for the determination of the legislature; that there are many restraints to which every person is necessarily subject for the common good; and that laws enacted under the police power to promote such purpose may be sustained, although they interfere, to some extent, with the liberty of the citizen and the freedom of contract. On the other hand, it is conceded by the state that such laws, to be valid, and within the police power, must not be arbitrary or capricious, but reasonable and have a reasonable relation to the object to be accomplished.

Such concessions render it unnecessary for us to discuss at length some of the points, or to review the many cases cited. It is said by counsel for appellees that the only debatable ground in the case is whether this statute comes within the police power as a measure tending to prevent the liability to

fraud and deception; that this is the real question. The wisdom or expediency of such a measure is not for the determination of the court.

The presumptions are in favor of the exercise of the power in the enactment. We are to overthrow the act, if at all, only when it violates the constitution "clearly, palpably, plainly and in such manner as to leave no reasonable doubt." The question is whether there is any reasonable ground upon which the legislature, acting within its conceded powers, could pass such a law as that now in question. The courts have not attempted to accurately define the limit of the police power, nor is it advisable to do so, because of changing conditions. The power is broad, but subordinate to the constitution. The courts may and will interfere in a proper case where the legislature has clearly exceeded the constitutional limitations. It is not enough that the case is a doubtful one. Though we might be of the opinion that an 8 per cent. or some other standard should have been established, still we ought not to interfere with the standard fixed by the legislature, unless such standard is clearly arbitrary and unreasonable. We shall not take the space to give definitions of police power. The question is discussed at length in the following, among others, of our own cases: *McGuire v. Railway*, 131 Iowa 340, 354; *State v. Schlenker*, 112 Iowa 642; *State v. Packing Co.*, 124 Iowa 323.

It is not claimed by either side, as we understand it, that the act in question is a health law. The claim of the state is that the purpose of the legislature was to prevent the perpetration of fraud upon the public. The public welfare embraces a variety of interests calling for public care and control. These are: "The primary social interests of safety, order and morals; economic interests; and non-material and political interests." Freund Police Power, Secs. 9, 15.

The claim here is that the act fixing a standard for ice cream deals with economic interests, the purpose being, as

3. CONSTITU-
TIONAL LAW:
presumption of
constitutional-
ity: reluctance
to overthrow
act: privilege
to defraud:
state of facts
justifying act.

already stated, to prevent fraud. It was said in one of the milk cases, *State v. Schlenker,* 112 Iowa 642: "It is not enough to show that defendant did not intend to defraud, or that the milk he sold was wholesome. . . . It is enough that adulteration such as prescribed by the statute may defraud, or prove deleterious to the public health or comfort. The legislature may well determine that the adulteration of milk tends to facilitate vicious practices and that it ought to be prohibited."

Laws tending to prevent fraud and to require honest weights and measures in the transaction of business have been frequently sustained in the courts. *McLean v. Arkansas,* 211 U. S. 539, 550.

The constitution does not secure to anyone the privilege of defrauding the public. *Plumley v. Mass.,* 155 U. S. 461, 479.

As bearing upon the question as to whether this statute, fixing a certain standard for ice cream, is so manifestly arbitrary and unreasonable as that the legislature was not justified, 

4. Constitu-
tional law:
state of facts
justifying law:
judicial knowl-
edge.

under the police power, in enacting it, and whether fraud might have been practiced upon the public in the sale of ice cream, we should here refer to conditions and some of the facts which we ought to presume were known to the legislature when the statute was enacted. We say this because some of the facts and conditions called to our attention existed and were of more or less notoriety at the time of the passage of this law. We are asked to consider these facts and conditions for the purpose of determining whether the act is so manifestly arbitrary and unreasonable as to require us to hold it invalid. If, under any possible state of facts, the act would be constitutional and valid, the court is bound to presume that such conditions existed; whether a state of facts existed which called for the enactment of this legislation was for the determination of the Legislature. *McGuire v. Railway, supra.*

An authority is cited to the effect that when a question of fact is debated or debatable, and the extent to which a constitutional limitation goes is affected by the truth in respect

to that fact, the court will take judicial cognizance of all matters of general knowledge, and will consider expressions of opinion from other than judicial sources given by those qualified by their skill and experience to express such opinions. *Muller v. Oregon*, 208 U. S. 412.

Just how far we should go in regard to such matters, where, as in this case, the decision was on demurrer, we need not determine, for the reason that we are asked by both sides, without objection from either, to consider depositions taken for use, had the case been tried on the merits, reports, trade journals, cookbooks containing a great many formulas for making ice cream, circulars, and the like. These have been abstracted and certified. We shall not attempt to set out all these matters, but enough to illustrate in a general way the points made.

It appears that in seventeen states the standard fixed for ice cream to be sold is 14 per cent.; five states have fixed the standard at 12 per cent. butter fat, the same as our own; but five states which have legislated have a lower standard than Iowa. The federal government fixes the standard for ice cream at 14 per cent. It should be said as to the 14 per cent. standard fixed by the federal government that it is not claimed that such standard has been fixed by law, but by the United States Department of Agriculture. But, even though not law, it would be a circumstance proper to be considered as the opinion of that department. The legislature would not be bound entirely by the conflicting opinion of any of the persons we shall refer to. From these documents, it appears that there is a difference of opinion as to the advisability of establishing a standard for ice cream, or if it is established, the per cent. of butter fat the product should contain. Some think a high standard of butter fat is injurious to health, especially for children and invalids; others object to high butter fat contents during the summer months, on account of the shortage in the supply. It is contended by some that ice cream should be made from cream, sugar and flavor solely. An article in a trade journal says:

''Commissioners have agitated a high butter fat standard and we have the significant controverting fact that nowhere is there a great ice cream business built up on a high butter fat formula. The ice cream manufacturers know what the public wants. It does not want an over rich product because it cannot eat enough of it.''

The same article states:

''The moral support of the dairyman, the creamery men and the cheese manufacturer and the milk dealer in these matters will help greatly. They have only to remember that when the ice cream man cuts his butter fat content, he adds condensed and that one is about as valuable as the other, if anything condensed is more valuable because it allows the use of all the milk.''

Large manufacturers of ice cream from different parts of the country gave testimony and gave their opinions from their standpoint. They state that they would not attempt to define ice cream, because it covers a large number of frozen substances; that there is an unlimited number of formulas; cream should be a part of the mix, the same as sugar or flavor. When condensed milk is used, the purpose is to add solids, thereby giving the cream better body; the purpose of the cream is to add to the flavor and to add to the body; the largest dealers in the United States are not so-called high butter fat men; butter fat is not the best solid to provide body for ice cream; there are manufacturers who make a high butter fat ice cream and cater only to exclusive trade and get a long price for it. One witness says:

''Speaking in a commercial sense, I do not believe raising the standard to 12 per cent. would materially affect the price of the ice cream. It would diminish the amount of other solids which would be put in it; the milk producer's skim milk would go to waste. The use of condensed milk has very much increased during the last few years because of the increased

demand for ice cream and the extensive use of milk solids in ice cream. Millions of gallons of skim milk used to be thrown away which is now converted into condensed milk and there is a ready market for it. My experience is that the public prefers 8 per cent. ice cream to 12 per cent. The 8 per cent. standard was arrived at in Illinois by a commission which investigated the matter and arrived at the standard of 8 per cent. I do not think there should be any standard at all.''

Other witnesses gave similar testimony. One manufacturer of many years' experience says that years ago ice cream would test so low in butter fat that you would not know how to find it; that it was then made out of milk, eggs, and cornstarch, but that later, ''We enlarged the butter fat in it.'' He says that the man who makes high butter fat ice cream will have to demand more money for it; that normal butter fat ice cream runs from 6 per cent. to 10 per cent.; that the per cent. of butter fat has no relation to its wholesomeness.

Defendants show that consumers would eat a less quantity of ice cream which is rich in butter fat. This would decrease the consumption by the public, and the output and profits of the manufacturers. This would not, perhaps, be a reason for fixing a standard, but may bear on the motive of those who oppose it and affect their claims as to whether the standard is unreasonable. As stated, there are many formulas for making ice cream. Here is one: ''Vanilla Ice Cream Without Cream or Milk. One vanilla bean, 8 gills of syrup at 20 degrees, 18 egg yolks. (To be cooked and frozen.) Then work in a meringue made of 2 egg whites and ¼ lb. of sugar.''

It is shown that the cost to manufacture ice cream containing 20 per cent. butter fat is 45 cents per gallon; containing 7.7 per cent., 29 cents; and that where condensed milk is used and the product contains 1.9 per cent. butter fat, the cost is 15½ cents per gallon.

We have set out these matters somewhat in detail for the purpose of showing that the consumer may be defrauded, and as showing the propriety or necessity for fixing a standard, or

rather to show that the legislature might properly so determine. We quote at some length from one of the documents submitted:

"Ice cream is one of the delights of the food adulterator, for ice cream is a mixture of various things in which each one more or less loses its identity. The adulterator is able therefore to inject all manner of inferior and often dangerous cheapeners into his product and to compete successfully with the honest manufacturer who makes clean, wholesome ice cream.

"The honest ice cream maker today is working at a decided disadvantage when he is obliged to compete with the dishonest one, since the dishonest one need not label his product so that the ingredients will be shown to the consumer or even to the retailer. This fact was strikingly shown at a recent meeting of ice cream manufacturers in New York, at which one man present declared that it was impossible for a competitive ice cream maker to be honest. This man asserted, and with much reason, that there were three things that made manufacturers dishonest. These three things were the federal government and the state and municipal departments of health, all of which encourage the dishonest manufacturer at the expense of the honest one. As a basis of his argument this man presented three formulas for making commercial ice cream which speak for themselves. Here they are:

## "FORMULA NO. 1.

"Sells to retailer at $1.25 per gallon.

| | |
|---|---|
| 11 quarts 40% of cream at 45c | $4.95 |
| 5 quarts grade B milk at 6½c | .33 |
| 4 quarts condensed milk at 20c | .80 |
| 9 pounds sugar | .45 |
| 4 ounces extract | .40 |
| | $6.93 |

"When expanded by freezing this quantity of ingredients produces forty quarts of ice cream, containing 20% butter fat at a cost of less than 80c per gallon.

## "FORMULA NO. 2.

"Sells to retailer at 90c per gallon.

| | |
|---|---:|
| 3 quarts 40% cream at 45c | $1.35 |
| 13 quarts grade B milk at 6½c | .85 |
| 4 quarts condensed milk at 20c | .80 |
| 4 ounces gelatine at 24c per lb | .06 |
| 4 ounces extract | .40 |
| 7½ pounds sugar | .38 |
| | $3.84 |

"These ingredients expanded by freezing yield forty quarts of ice cream containing 7½% butter fat at a cost of 38c a gallon.

## "FORMULA NO. 3.

| | |
|---|---:|
| 10 gallons of condensed milk | $8.00 |
| 10 gallons grade B milk | 2.60 |
| 60 gallons plain water | 0.00 |
| 4 pounds gelatine at 20c | .80 |
| Color | .01 |
| Flavor | 1.00 |
| 60 pounds sugar at 5c | 3.00 |
| | $15.41 |

"These ingredients expanded by freezing yield 120 gallons of 'ice cream' at a cost of 13 cents a gallon.

"What the ice cream makers, and consumers as well, need is the creation of ice cream standards and laws which would compel the manufacturers who make 'cheap' ice cream to correctly label their product. A law is needed in New York and other places which will state how much butter fat must be contained in ice cream before it can be called ice cream, and which will prevent the use of gelatine reeking with millions of bacteria and of coal tar dyes, unless these ingredients are labeled.

"Ice cream is a commercially manufactured commodity, and as such should be adequately regulated by the health authorities, both for the benefit of the honest manufacturers and the innocent consumers."

Notwithstanding these conflicting opinions, it was a question for the legislature to say whether this legislation was called for. The legislature was not compelled to take the view of either those who favor or oppose a standard. Taking one view of it, conditions were such as to clearly sustain the action of the legislature. We are not entirely satisfied that this would not be so if conditions were as claimed by the defendants. We are not to say, and do not, of course, determine that these defendants, or the association appearing in argument, or any particular person is or has been guilty of any fraud or deception. The question is whether, without a standard, dishonest or unscrupulous manufacturers may do so. It is not practicable by any ordinary inspection for the purchaser to distinguish cheaper, low-grade ice cream from the better quality. Because of this, it is apparent from the matters which we have detailed that an opportunity is afforded for deception by selling an inferior quality of ice cream at the price of a better or more expensive grade. This was the case in the sale of oleomargarine. *State v. Packing Co.*, 124 Iowa 323. In this respect, it differs from the case of *Frost v. Chicago,* 178 Ill. 250, where it was held that a person who is ordinarily careful and intelligent could not be deceived by a netting covering for baskets of fruit. In such case, the purchaser could still see and know what he was buying.

The purpose of the act in question was to prevent just such deception and fraud as would be possible without a standard, and it seems to us it cannot be seriously claimed that the statute will not accomplish the end sought.

It is said by defendants that they are deprived of the

right to sell their product if it contains a less per cent. of butter fat than that prescribed by the statute and that the sale of such is entirely prohibited. This, we think, is an assumption not warranted. They may sell it for what it really is. Possibly it would sell as readily if it is named and sold as frozen skim milk; if not, this would be an additional argument for prohibiting the sale of so-called ice cream made from evaporated skim milk as ice cream.

5. STATUTES: construction: absolute or qualified pro- hibition on sale : ice cream standard act.

The state contends that every point in this case is decided against the contentions of defendants in *State v. Schlenker*, *supra*, and *State v. Snow*, 81 Iowa 642. They are very closely in point.

The only case called to our attention in which the question of fixing a standard for ice cream was decided is *Rigbers v. City of Atlanta*, 66 S. E. 991. In that case, under an ordinance, the prohibition was not against selling ice cream of less than the prescribed percentage, as ice cream, but against selling it at all. The provision of the ordinance is: "Ice cream sold or kept for sale must contain at least 10% butter fats, for fruit ice cream, and 12% for plain ice cream." Under this ordinance, ice cream could not be sold or kept for sale unless it contained the required per cent. of butter fat. As already stated, our statute does not prohibit the sale of such product. In the Georgia case, the court said: "It might be permissible to say that the term 'ice cream' . . . should relate only to ice cream of a certain prescribed richness, and that whoever sold ice cream of poorer quality should either by calling it under some other name, or by indicating on the vessel in which it is delivered, or otherwise, disclose the inferiority of its quality"—thus recognizing the distinction which we make between that ordinance and our statute, and holding that the sale of ice cream may be regulated by fixing a standard. Our statute fixes a standard for ice cream and prohibits the sale of anything else as ice cream, but the sale of a product formerly known as ice cream, but containing a lower per cent.

of fat than that prescribed by the statute, is not prohibited. It may be sold for what it is. It may be sold under some other name and the consumer will not be deceived, for he now knows that when he buys ice cream he is getting an article containing a certain per cent. of butter fat, and that this may not be so if he buys something not as ice cream, but as something else.

Defendants say their case comes within the doctrine of *People v. Marx,* 99 N. Y. 377. This must be on the erroneous assumption that the Iowa statute prohibits absolutely the sale of their product if it contains less than the specified per cent. of fat. The New York statute referred to in the *Marx Case* did prohibit the sale of oleomargarine, which was shown to be a wholesome article and not injurious, and the statute was held invalid. That statute was amended so as to regulate the sale and held valid in *People v. Arensberg,* 105 N. Y. 123, 128, 11 N. E. 277. As amended, the statute was entitled: "An act to prevent deception in the sale of dairy products," etc. It prohibited: (1) The manufacture out of any animal fat, or animal or vegetable oils not produced from unadulterated milk, or cream from the same, of any product in imitation or semblance or designed to take the place of any natural butter produced from milk, etc.; (2) mixing, compounding with, or adding to milk, cream or butter, any acids or other deleterious substances, or animal fats, etc., with design or intent to produce any article in imitation or semblance of natural butter; (3) selling, or keeping, or offering for sale, any article manufactured in violation of the provisions of the section.

The defendant was convicted of selling the article manufactured in violation of the provisions of the act. The court said:

"Assuming, as is claimed, that butter made from animal fat or oil is as wholesome, nutritious and suitable for food as dairy butter; that it is composed of the same elements and is substantially the same article, except as regards its origin;

and that it is cheaper; and that it would be a violation of the constitutional rights and liberties of the people to prohibit them from manufacturing or dealing in it, for the mere purpose of protecting the producers of dairy butter against competition, yet it cannot be claimed that the producers of butter made from animal fats or oils have any constitutional right to resort to devices for the purpose of making their product resemble in appearance the more expensive article known as 'dairy butter,' or that it is beyond the power of the legislature to enact such laws as they may deem necessary, to prevent the simulated article being put upon the market in such a form and manner as to be calculated to deceive. If it possesses the merits which are claimed for it, and is innocuous, those making and dealing in it should be protected in the enjoyment of liberty in those respects; but they may legally be required to sell it for and as what it actually is, and upon its own merits, and are not entitled to the benefit of any additional market value which may be imparted to it by resorting to artificial means to make it resemble dairy butter in appearance. It may be butter, but it is not butter made from cream, and the difference in cost or market value, if no other, would make it a fraud to pass off one article for the other.''

*In re Jacobs,* 98 N. Y. 98, is cited. In that case, the statute purported to be an act to improve the public health by prohibiting the manufacture of cigars in tenement houses. It was held that it was not a health law; that cigar making had no relation to the health of the public and that the act was not intended to protect the health of the occupants of the tenement. In that case it was held, and the proposition is not disputed by the state, that the constitutional guaranty that no person shall be deprived of his property without due process of law may be violated without the physical taking of property for public or private use, and that any law which destroys it or its value, or takes away any of its essential

attributes, deprives the owner of his property. *People v. Biesecker,* 169 N. Y. 53, 61 N. E. 990, is also cited. It was there held that the statutes under consideration could not be justified as an exercise of power to prevent fraud or imposition on buyers and consumers.

We have referred to these New York cases more fully than necessary, perhaps, but, because of the claim made for the *Marx Case,* we have thought it proper to refer briefly to the others as well. The *Marx Case* is cited and distinguished in *State v. Snow,* 81 Iowa 642.

In *Schmidinger v. Chicago,* 226 U. S. 578, 57 L. Ed. 364, it was held that a city ordinance, fixing the weight of the standard loaf of bread to be sold in the city, and prohibiting the making or selling of loaves not up to the weight of the standard loaf, is not such an unreasonable and arbitrary exercise of the police power as to render the ordinance void under the constitution, prohibiting the taking of property without due process. It was shown in that case that there was a considerable demand for loaves of different size, and that so fixing the size produced some inconvenience. The ordinance was sustained upon the theory that it tended to prevent fraud in the sale of bread. The court said:

"Furthermore, laws and ordinances of the character of the one here under consideration and tending to prevent frauds and requiring honest weights and measures in the sale of articles of general consumption, have long been considered lawful exercise of the police power." And that: "This court has had frequent occasion to declare that there is no absolute freedom of contract. The exercise of the police power fixing weights and measures and standard sizes must necessarily limit the freedom of contract which would otherwise exist. Such limitations are constantly imposed upon the right to contract freely, because of restrictions upon that right deemed necessary in the interest of the general welfare." And that: "So long as such action has a reasonable relation to the

exercise of the power belonging to the local legislative body and is not so arbitrary or capricious as to be a deprivation of due process of law, freedom of contract is not interfered with in a constitutional sense.''

That the legislature of the states may, in the exercise of the police power, regulate a lawful business, see *Barrett v. Indiana,* 229 U. S. 26, 57 L. Ed. 1050.

The following cases may be cited as bearing upon the proposition that the legislature, under its police power, may enact laws for the purpose of preventing fraud in the sale of food products: *State v. Campbell,* 64 N. H. 402; *Board v. Van Druens,* 72 Atl. (N. J.) 125; *People v. Bowen,* 182 N. Y. 1; *Chicago v. Bowman Dairy Co.,* 234 Ill. 294; *People v. Worden Grocer Co.,* 118 Mich. 604; *State v. Crescent Creamery Co.,* 54 L. R. A. (Minn.) 466.

All points raised by the demurrers have been noticed. We are of opinion that the statute is within the police power of the state and is not unreasonable; that it has a reasonable relation to the object to be effected and does not offend against either the federal or state constitution in any of the particulars mentioned. It follows that the court erred in sustaining the demurrers. Both cases are *Reversed* and *Remanded.*

The Justices all concur.